FILED
SEP 2 1 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VLADIMIR MOUTAFOV,<br>1124 Haycock Rd., Apt. B-1, Falls Church, VA 22046;<br><br>        Plaintiff,<br><br> v.<br><br>MICHAEL CHERTOFF, Secretary,<br>U.S. Department of Homeland Security,<br>425 Murray Drive, Building 410,<br>Washington, DC 20528;<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br>425 Murray Drive, Building 410,<br>Washington, DC 20528;<br><br>ROBERT DIVINE, Acting Director,<br>U.S. Citizenship and Immigration Services,<br>20 Massachusetts Avenue, N.W.,<br>Washington, DC 20529;<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br>20 Massachusetts Avenue, N.W.,<br>Washington, DC 20529;<br><br>ROBERT S. MUELLER, Director,<br>Federal Bureau of Investigation,<br>J. Edgar Hoover Building,<br>935 Pennsylvania Avenue, N.W.,<br>Washington, DC 20535;<br><br>and<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>J. Edgar Hoover Building,<br>935 Pennsylvania Avenue, N.W.,<br>Washington, DC 20535;<br><br>        Defendants. | Case No.<br><br><br><br><br><br><br><br><br><br>CASE NUMBER 1:05CV01860<br><br>JUDGE: Rosemary M. Collyer<br><br>DECK TYPE: TRO/Preliminary Injunction<br><br>DATE STAMP: 09/21/2005 |

**EMERGENCY MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Now comes the Plaintiff, VLADIMIR MOUTAFOV, by his attorney, Thomas A. Elliot, and pursuant to FRCP 65, moves this Honorable Court to grant Preliminary Injunctive Relief to the Plaintiff and to compel the Defendants, MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, EDUARDO AGUIRRE, JR., Director, U.S. Citizenship and Immigration Services, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, ROBERT S. MUELLER, Director, Federal Bureau of Investigation, and FEDERAL BUREAU OF INVESTIGATION, and the defendant agencies, to execute and otherwise process the Plaintiff's application for adjustment to permanent resident, on or before September 30, 2005. In support, the Plaintiff states as follows:

## I. FACTS

Through the diversity visa program, a limited number of immigrant visas are made available to individuals from countries that historically have had low rates of immigration to the United States. 8 U.S.C. § 1153(c). Under the program, the U.S. Attorney General identified "low-admission states" and allocates diversity visas (immigrant visas made available through the diversity visa program) to natives of these states according to a formula established by statute. 8 U.S.C. § 1153(c)(1). A diversity visa enables the recipient to move to the United States as a lawful permanent resident (or, alternatively, to remain in the United States as a lawful permanent resident if the recipient is already lawfully within the United States and if the Attorney General adjusts the recipient's status) under the Immigration and Nationality Act ("INA"). To be eligible for a diversity visa, an alien must have a high school education or have, within five years of the date of application for the visa, at least two years of work experience in an occupation

2

that requires at least two years of training or experience. 8 U.S.C. § 1153(c)(2). If the alien is entitled to receive a visa under the diversity visa program, the alien's spouse and minor children are entitled to the same status. 8 U.S.C. § 1153(d). (Verified Complaint ("VC"), para. 44).

The United States Department of State administers the diversity visa program. Eligible applicants must file a petition to be considered for a diversity visa, and after the filing period has ended, a computer randomly orders the petitions. 22 C.F.R. § 42.33(c). The U.S. State Department then selects, in rank order, a quantity of petitions estimated to be sufficient to ensure, to the extent possible, that all diversity visas authorized for issuance are issued. *Id.* These selected applicants – commonly referred to as diversity visa program "lottery winners" – are notified of their selection and receive instructions on how to apply for a diversity visa. *See* Notice of Registration Period and Requirements for the Fourth Year of the Diversity Immigrant Visa Program, 61 Fed. Reg. 58,730, 58,731 (Nov. 18, 1996). (VC, para. 45).

Diversity visa lottery winners who reside abroad must travel to a United States embassy to complete the visa eligibility process. If a lottery winner is lawfully present in the United States, however, the alien may remain in the United States and apply to the Department of Homeland Security ("DHS") to adjust his status to that of a lawful permanent resident. 8 U.S.C. § 1255(a). This adjustment procedure enables a lottery winner lawfully residing in the United States, such as an alien in a nonimmigrant student status, to receive immigrant status without returning to his native country. (VC, para. 47).

The DHS, at its discretion, may adjust an applicant's status to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for adjustment of status, (2) the alien is eligible to receive an immigrant visa and is admissible for permanent residence, and (3) a visa is immediately available to the alien at the time the application is filed. 8 U.S.C. § 1255(a). According to the statute, "[a]liens who qualify, through random selection, for a visa under [the diversity visa program] shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). (VC, para. 48).

The State Department has promulgated regulatory provisions that automatically revoke diversity visa petitions and prevent the issuance of visas and the allotment of visa numbers after midnight of the final day of the relevant fiscal year. *See* 22 C.F.R. § 42.33(a)(1) ("The eligibility for a visa . . . ceases at the end of the fiscal year in question. Under no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility."); 22 C.F.R. § 42.33(e) ("A petition . . . shall be valid until Midnight of the last day of the fiscal year for which the petition was submitted. At that time, the petition is automatically revoked . . . and no diversity visa numbers can be allotted after that date."); 22 C.F.R. § 42.33(g) (Diversity immigrant visa numbers "shall be allotted only during the fiscal year for which a petition to accord diversity immigrant status was submitted and approved. Under no circumstances shall immigrant visa numbers be allotted after Midnight of the last day of the fiscal year for which the petition was submitted and approved."). (VC, para. 49).

4

In or about September 2000, Plaintiff Vladimir Moutafov entered the United States with his wife Marlena Moutafov and his minor son Racho Moutafov. (VC, para. 5). Vladimir Moutafov is currently enrolled as a full-time student at Frostburg State University in Frostburg, Maryland, under an F-1 status. (VC, para. 6, 7). On or about July 8, 2004, Plaintiff Vladimir Moutafov, his wife Marlena, and his son Racho were selected under the 2005 DV Lottery to be processed for an adjustment of status. Adjustment of status is the administrative process of declaring an applicant to be a lawful permanent resident of the United States without leaving the country. Immigration and Nationality Act § 245, 8 U.S.C. § 1255. (VC, para. 8).

Pursuant to U.S. Citizenship and Immigration Services ("CIS") written instructions, Plaintiff Vladimir Moutafov, his wife Marlena, and their minor child Racho applied for visas under the 2005 DV Lottery at the earliest possible date, on or about January 18, 2005. (VC, para. 14). The U.S. Department of Homeland Security acknowledged receipt of the Moutafovs' applications for lawful permanent residence in the United States on March 1, 2005. (VC, para. 13).

Pursuant to the requirements of the application process, the Moutafovs submitted their fingerprints to CIS on or about March 8, 2005. (VC, para. 14). On or about March 15, 2005, the Moutafovs were interviewed by a CIS officer, who advised Marlena and Racho Moutafov that their background checks had been completed. Vladimir Moutafov was advised by the officer that his FBI name check was still pending, and was given a letter indicating that his case had been continued for "G-325 FBI Name Check." The letter stated: "There are no means in which to predict the amount of time security checks

5

will require to clear; therefore, please wait 180 days after the date of interview before making an inquiry." (VC, para. 15).

On or about May 4, 2005, Marlena and Racho Moutafov each received in the mail from CIS a Notice of Action (Form I-797C), entitled "Welcome to the United States of America," informing them that their applications for permanent residence had been approved. (VC, para. 17). On or about May 12, 2005, Marlena and Racho Moutafov each received in the mail from CIS an Alien Registration Receipt Card (Form I-551), commonly known as a Resident Alien card or "green card." (VC, para. 18).

Plaintiff Vladimir Moutafov made numerous inquiries to CIS thereafter, including writing letters, sending facsimiles and e-mails, making telephone calls, and visiting CIS offices in person to inquire about the status of his case. (VC, para. 19, 20, 23, 24, 30, 32, 33 and exhibits attached thereto). Moutafov was repeatedly informed that his application was still pending. (VC, para. 20, 23, 26, 34, 35, 40). In addition, Moutafov made numerous inquiries to the FBI, including letters, facsimiles, emails, and telephone calls. (VC, para. 21, 22, 25-28, 35-37, 39 and exhibits attached thereto). He also wrote letters to both United States Senators from Virginia and the U.S. Representative for the Eighth Congressional District of Virginia, and his attorneys spoke in person and exchanged emails with officers from the Washington District Office of CIS, including Director Phyllis Howard, Deputy Director Susan Dibbins, and Supervisory District Adjudications Officer June Williams. (VC, para. 23, 24, 28, 30-34, 38 and exhibits attached thereto).

Plaintiff Vladimir Moutafov has not been given any information as to when his application will be processed and adjudicated and when, if ever, a permanent visa will be issued to him. (VC, para. 42).

## II. APPLICABLE LAW

A preliminary injunction may be granted if the movant demonstrates that "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. International Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999); *see also Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Dodd v. Fleming*, 223 F. Supp. 2d 15, 19 (D.D.C. 2002); *Mylan Pharmaceuticals Inc. v. Henney*, 94 F. Supp. 2d 36, 44-45 (D.D.C. 2000).

Once the movant satisfies these three threshold requirements, the court then balances the harm to the non-movant if the injunction is granted against the harm to the movant if the injunction is denied. *See Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). This balancing is conducted on a sliding scale: "a particularly strong showing on one factor may compensate for a weak showing on other factors." *Dodd*, 223 F. Supp. 2d at 20; *see also Davenport*, 166 F.3d at 360-61; *CityFed Fin. Corp.*, 58 F.3d at 747. In addition, the court must take into account the public interest at risk if injunctive relief is granted or denied. *Davenport*, 166 F.3d at 360; *Mova*, 140 F.3d at 1066.

## III. APPLICATION OF LAW

### A. The Case Has A Likelihood of Success On The Merits

This Court has held that it is particularly important for the movant to demonstrate a likelihood of success on the merits. *Dodd*, 223 F. Supp. 2d at 20; *see also Benten v.*

*Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam). The Court has stated that absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *American Bankers Ass'n v. National Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999); *see also Dodd*, 223 F. Supp. 2d at 20. Moreover, where other factors favor the issuance of an injunction, a movant can satisfy the condition that it likely will prevail on the merits by raising a serious question on the legal merits of the case. *Massachusetts Law Reform Institute v. Legal Services Corp.*, 581 F. Supp. 1179, 1184 (D.D.C. 1984).

In this case, the only factor preventing the adjudication of the Plaintiff's application is the Defendants' inaction. The Plaintiff has complied with all that was required of him under the law. The administrative process is out of his hands. The Defendants, for whatever reason, have failed to process and adjudicate the Plaintiff's pending application. The remaining tasks are ministerial.

There is a great likelihood that the Plaintiff will succeed on his claim. The section of the INA covering the diversity visa program ("DV Program") repeatedly commands the Attorney General (now the Secretary of the DHS), in nondiscretionary language, to perform a variety of tasks, including issuing visa numbers to eligible, qualified immigrants. 8 U.S.C. §§1153(c)(1)(A), (c)(1)(B)(i), (c)(1)(B)(ii), (c)(1)(C), (c)(1)(D), (c)(1)(E)(iv), (e). Congress selected the term "shall" to describe the Attorney General's (now DHS Secretary's) various duties in administering the DV Program: "Immigrant visa numbers made available under subsection (c) of this section (relating to diversity immigrants) *shall be issued* to eligible qualified immigrants strictly in a random order

8

established by the Secretary of State for the fiscal year involved." 8 U.S.C. § 1153(e)(2) (emphasis added); *see also Iddir v. INS*, 301 F.3d 492, 500 (7th Cir. 2002) (holding that DV Program applicants "have a clear right to have their cases adjudicated"). The term "shall" denotes a clear directive, a command, as opposed to the terms "may" or "in his discretion" used in a statute such as 8 U.S.C. § 1255(a), pertaining to adjustment of status to lawful permanent resident. *See Iddir*, 301 F.3d at 499; *see also, e.g., Miller v. French*, 530 U.S. 327, 337 (2000); *Kuhlmann v. Wilson*, 477 U.S. 436, 449 n.11 (1986); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982) ("The words chosen by Congress ["'*shall pay* to the seaman' the sums specified '*for each and every day* during which payment is delayed'"], given their plain meaning, leave no room for the exercise of discretion either in deciding whether to exact payment or in choosing the period of days by which the payment is to be calculated.") (emphasis in original).

By contrast, the Defendants can point to no section of the INA that would authorize them to proceed as they have in this case: that is, to do nothing. *See, e.g., Paunescu v. INS*, 76 F. Supp. 2d 896, 901 (N.D. Ill. 1999); *Setharatsonphou v. Reno*, 1999 WL 755292 (N.D. Ill. 1999). The Government clearly enjoys discretion over *how* it resolves visa applications, but not over *whether* it resolves them. *Jaffer v. Reno*, 2000 WL 86652 (N.D. Ill. Jan. 19, 2000); *Dabone v. Thornburgh*, 734 F. Supp. 195, (E.D. Pa. 1990). As one court has made clear, "the failure to adjudicate an application is different from the denial of an application." *Paunescu*, 76 F. Supp. 2d at 901; *see also Forest Guardians v. Babbitt*, 164 F.3d 1251, 1269 (10th Cir. 1998) ("Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform.").

9

Admittedly, the INA contains no provision stating *when* an application for a visa must be adjudicated. However, as the courts have consistently held, the relevant statutes and regulations pertaining to the DV Program confirm that the DHS has a duty to adjudicate aliens' visa applications "in a reasonable period of time." *Iddir*, 301 F.3d at 500; *Nyaga v. Ashcroft*, 186 F. Supp. 2d 1244, (N.D. Ga. 2002) ("[T]he Government has a non-discretionary duty to make diligent efforts in furtherance of adjudicating diversity visa applications."). The view of the federal district courts on this issue is unequivocal: "[T]he adjudication [of the visa] must occur within a reasonable time. A contrary position would permit the INS to delay indefinitely. Congress could not have intended to authorize potentially interminable delays." *Agbemaple v. INS*, 1998 WL 292441, *2 (N.D. Ill. May 18, 1998); *see also Forest Guardians*, 164 F.3d at 1267 ("A contrary position would permit the INS to delay indefinitely."); *Yu v. Brown*, 36 F. Supp. 2d 922, 931-32 (D.N.M. 1999) ("All other courts addressing this question have held that INS has a non-discretionary duty to . . . complete processing of Plaintiffs' [lawful permanent resident] applications in a reasonable time.") (*citing Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1182 (2d Cir. 1978); *Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995); *Fraga v. Smith*, 607 F. Supp. 517, 521 (D. Or. 1985); *Agbemaple*, 1998 WL 292441 at *2).

In the case at bar, that "reasonable time" must be within the fiscal year. Otherwise, a right to timely adjudication would be rendered meaningless. As one court has assessed the situation, "plaintiffs have a *right* to have their applications for adjustment of status adjudicated, defendants have a *duty* to perform this adjudication

within a reasonable time, and *no other remedy* is available." *Paunescu*, 76 F. Supp. 2d at 901 (emphasis added).

Decisions from this Court's sister districts are instructive. Similarly aggrieved persons have successfully sought and obtained relief for the failure of the INS (now CIS) to process their visa applications before the fiscal year expired. In *Paunescu v. INS*, *supra*, the district court was faced with an almost identical fact situation to that presented here. The plaintiffs in *Paunescu* filed a mandamus action to compel the Government to process their DV visa applications. The plaintiffs' action was brought prior to the expiration of the fiscal year. Upon the plaintiffs' motion for preliminary injunctive relief, the court ordered the defendants to "immediately complete adjudications for adjustment of status for both plaintiffs, without delay, and by no later than September 30, 1998." 76 F. Supp. 2d at 898. The court concluded that it had mandamus jurisdiction over the case, finding that the plaintiffs had a clear right to the relief sought, the INS had a clear duty to issue a decision on the adjustment of status applications, and no other remedy was available to the plaintiffs. *Id.* at 901. Furthermore, the court proceeded to chastise the Government for its inaction: "Plaintiffs were the victims of a bureaucratic nightmare. Although defendants have demonstrated that they made some efforts to comply with this court's September 25, 1999, order, the evidence demonstrates that none of the responsible parties coordinated their efforts to ensure that this court's order could be implemented. Plaintiffs should not be penalized for the government's malfeasance." *Id.* at 902.

Likewise, in *Nyaga v. Ashcroft*, *supra*, the district court examined the Government's failure to act or follow through on processing an alien's diversity visa

11

application, which resulted in its eventual denial. Noting that "[t]he Government's failure to act to process Plaintiff Nyaga's diversity visa application is the sole reason the application was not adjudicated before the fiscal year ended," the court determined that it could compel the Government to act, and adjudicate the visa application, notwithstanding the expiration of the fiscal year in which it had been filed. 186 F. Supp. 2d at 1249, 1256.

In *Nyaga*, the INS took no action on the plaintiff's DV visa application after sending his fingerprints to the FBI for analysis, approximately seven months before the end of the fiscal year, and instructed the applicant not to contact the INS about his application because such inquiries would only "result in further delay." 186 F. Supp. 2d at 1248. The court found this inaction unacceptable.

> The court's rightful concern is that individuals who, in good faith, apply for visas and follow the rules set forth by the State Department and local INS offices not be denied the opportunity for meaningful adjudication of those applications due solely to neglect by the INS.

*Id.* at 1252. According to the court, "the Government has a non-discretionary duty to make diligent efforts in furtherance of adjudicating diversity visa applications." *Id.* at 1253 ("Plaintiff Nyaga has a right for the visa application to be processed and a final, thorough decision made."). The Government objected that, at this point, it was powerless to issue a visa, because the fiscal year in which the plaintiff had applied for the diversity visa had ended. *Id.* at 1256. The court rejected this argument – as well as the Government's motion for summary judgment on the same basis – and instead ordered the INS to "conduct a thorough review" of the plaintiff's diversity visa application to adjust status on the merits, as if the fiscal year in which it was filed had not yet expired. *Id.* at 1256-57 ("The court is not satisfied that the INS was incapable of processing an application that, by all accounts was in order and completed, and was to have been given

12

high priority, within seven months" since the alien's fingerprints were submitted to the FBI).

In *Marcetic v. INS*, 1998 WL 173129 (N.D. Ill. 1998), the plaintiff was also a near-victim of administrative and clerical error. Judge Moran wrote in the *Marcetic* decision,

> [S]omeone made a ministerial error, and it was not the plaintiff. Can plaintiff be denied a green card, separated from his family and ordered deported, in clear violation of the prior order, because of that administrative error? We think not. Judge Plunkett granted relief in similar circumstances in *Deaconu v. INS*, 96 C 5848, before the government even responded. That may cause that case to be a rather weak reed upon which to rely, but we can more confidently rely upon *Silva v. Bell*, 605 F.2d 978 (7th Cir. 1979), where the court had no hesitation (and neither did the INS) in undoing past mistakes. *Deaconu*, moreover, indicates that the INS can act if it is ordered to do so – there is nothing to suggest that the INS was unable to provide the relief ordered.

1998 WL 173129, at *1. Finally, in *Agbemaple v. INS*, *supra*, the plaintiff brought suit seeking mandamus relief in the form of an immediate adjudication of the processing of his visa petition and permanent resident application. On the Government's motion to dismiss, which was denied, the court wrote

> We hold that as a matter of law, Agbemaple is entitled to a decision within a reasonable time, and that it is within the power of the court to order such an adjudication. *See Nadler v. INS*, 737 F. Supp. 658, 659 (D.D.C. 1989) (citing law of the case in the form of an issued writ of mandamus "ordering the [INS] to adjudicate plaintiff's application for adjustment of status within thirty days"); *see also Matrapasqua v. Shaughnessy*, 180 F.2d 999, 1002 (2d Cir. 1950).

1998 WL 292441, at *2.

It is abundantly clear that the Plaintiff in this case is not unlike the petitioners in the cases discussed above, who sought relief in federal district court from ministerial delays and errors which threatened their adjustment of status. Similarly, the Plaintiff Vladimir Moutafov should be granted the relief requested.

13

**B.     No Adequate Remedy at Law and Irreparable Injury**

The Plaintiff has no recourse but to seek this injunction. Whether a plaintiff has an adequate remedy at law depends on whether the interim harm caused by the activity to be enjoined can be completely offset by a subsequent award of damages or other relief. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 517 (D.C. Cir. 1984); *Ichiyasu v. Christie, Manson & Woods Int'l, Inc.*, 630 F. Supp. 340, 342 (N.D. Ill. 1986), *citing Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 390 (7th Cir. 1985). In this case, no amount of money can compensate the Plaintiff for the loss of this unique chance to obtain lawful permanent resident status. No relief other than compelling the Defendants to complete their ministerial obligation can satisfy the Plaintiff.

In three recent circuit court opinions, *Iddir v. INS, supra, Ahmed v. DHS*, 328 F.3d 383 (7th Cir. 2003), and *Nyaga v. Ashcroft, supra*, the appellate courts addressed identical claims to those presented here, with one notable exception: **the mandamus actions in those cases were brought *after* the fiscal year had expired**. It was this fact only which compelled the courts to find that the plaintiffs could not prevail on their claims for mandamus relief. The courts found either that the district court lacked mandamus jurisdiction (*Iddir, Ahmed*), or that the plaintiffs' claims were moot (*Nyaga*), because the pertinent statutory authority for the issuance of a visa provided that if the visa was not issued prior to the fiscal year deadline, it evaporated. Even if the district courts could compel the Government to act, these cases found that the Government was deemed to have no duty to adjudicate the claims after the expiration of the fiscal year on September 30. *Iddir, supra; Ahmed, supra*.

These decisions teach that the Plaintiff in the case at bar has no adequate remedy and will suffer irreparably if the Court does not grant the relief requested. This relief must be granted before the end of the fiscal year, September 30, 2005, or the Plaintiff will be left not only with no visa, but also with no power to compel the Government to issue a visa. In fact, as the *Iddir* court noted,

> It would be a different case had the district court ordered the INS to adjudicate the appellant's status *while* the INS maintained statutory authority to issue the visas. *See Paunescu*, 76 F.Supp.2d at 902-03; *Marcetic*, 1998 WL 173129, at *2-3. In such a situation, the INS would be on notice to reserve visas and must complete the task, as ordered, before time expires. Allowing the INS to claim inability to issue visas at that point would impinge the authority of the court. *Paunescu*, 76 F.Supp.2d at 902-03; *Marcetic*, 1998 WL 173129, at *2-3.

301 F.3d at 501 n.2 (emphasis in original).

### C. Balance of Equities

If a movant is able to establish some likelihood of success on the merits, irreparable harm, and that there exists no adequate legal remedy, then the court must balance that showing with the harm to the non-movant and the public if injunctive relief is granted. *Serono Laboratories, Inc.*, 158 F.3d at 1318; *CityFed Fin. Corp.*, 58 F.3d at 747; *see also Leen v. Carr*, 945 F. Supp. 1151, 1155 (N.D. Ill. 1996), *citing Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The balancing of equities "involves a 'sliding scale' analysis: the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor." *Leen*, 945 F. Supp. at 1155, *citing Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994); *see also Serono*, 158 F.3d at 1318. In fact, the U.S. Court of Appeals for the D.C. Circuit has held that an injunction may be justified where there is a particularly strong likelihood of success on the merits even if there is a relatively slight

showing of irreparable injury. *CityFed Fin. Corp.*, 58 F.3d at 747; *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see also Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989) (holding that, despite such flexibility, moving party is required to demonstrate at least "some injury").

The balance of equities here overwhelming favors the Plaintiff. If the Plaintiff is granted the final and complete processing of his application for adjustment of status to permanent resident, the Defendants will only be compelled to perform what they are otherwise obligated to do.

## IV. CONCLUSION

The Plaintiff has complied fully with all requirements imposed on him. He has performed what should have been more than necessary to obtain his immigrant status. The Plaintiff should not be precluded from having his adjustment application processed as a result of the Defendants' administrative delay or clerical error. The gravity of this situation cannot be overstated. Once the current fiscal year ends, it is impossible, as a matter of law, for the Plaintiff to have his application for adjustment of status adjudicated. Furthermore, he may never again benefit from a random diversity visa lottery selection, and any subsequent attempts to obtain his permanent resident status will be delayed indefinitely.

WHEREFORE, the Plaintiff prays that this Court:

A.  Compel the Defendants and those acting under them to immediately perform their legal duty to complete all remaining process of the Plaintiff's adjustment of status application, including processing the Plaintiff's fingerprints and completing the

FBI name check, and issue and reserve a visa number to the Plaintiff, and issue a permanent visa (or Resident Alien card) to the Plaintiff;

 B. Alternatively, and solely in the event a visa is not issued before September 30, 2005, compel Defendants and those acting under them to reserve a visa number for the Plaintiff that will not expire on September 30, 2005, and until Defendants have properly and fully completed their ministerial duties;

 C. Declare that there are no just grounds to suspend issuance of lawful permanent resident status and all other appropriate documents to the Plaintiff;

 D. Grant reasonable attorneys' fees and costs of court under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(2);

 E. Grant such other further relief as this Court deems proper.

         Respectfully submitted,

         ELLIOT & MAYOCK

         _/s/ Thomas A. Elliot_
         Thomas A. Elliot

         1629 K Street, N.W., Suite 1250
         Washington, DC 20006
         (202) 429-1725
         DC Bar No. 259713

         Attorney for Plaintiff